1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

FEDERAL TRADE COMMISSION,

    Plaintiff,

v.

TANNER GARRETT VAUGHN, individually
and doing business as Lead Expose, Inc., and
Uptown Media, Inc.,

    Defendant.

Case No.

**PLAINTIFF'S APPLICATION FOR
TEMPORARY RESTRAINING
ORDER WITH ASSET
PRESERVATION, ACCOUNTING OF
ASSETS, OTHER EQUITABLE
RELIEF AND AN ORDER TO SHOW
CAUSE WHY PRELIMINARY
INJUNCTION SHOULD NOT ISSUE;
AND MEMORANDUM IN SUPPORT**

**Note on Motion Calendar:
April 15, 2011**

Motion for TRO and Supporting Memorandum

1
2

# TABLE OF CONTENTS

Page

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

II.   THE PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

    A.   Plaintiff Federal Trade Commission . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

    B.   Defendant Tanner Garret Vaughn . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

III.  DEFENDANT'S DECEPTIVE ADVERTISING PRACTICES . . . . . . . . . . . . . . . . . . . . . .  2

    A.   Background on Affiliate Marketing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

    B.   Defendant's False and Fraudulent Advertising Practices . . . . . . . . . . . . . . . . . . .  4

        1.   Deceptive Features of Defendant's Fake News Sites . . . . . . . . . . . . . . . . .  4

            a.   Defendant's Affirmative Misrepresentations . . . . . . . . . . . . . . . . . . . .  4

            b.   Defendant's Failures to Disclose . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

            c.   Defendant's False and Unsubstantiated Weight Loss Claims . . . . . . . .  8

        2.   Defendant's Aggressive Marketing Techniques . . . . . . . . . . . . . . . . . . . . .  10

IV.   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

    A.   Section 13(b) of the FTC Act Authorizes the Requested Injunctive Relief. . . . . . . . .  12

    B.   The FTC's Evidence Satisfies the Standard for Entry of a TRO and Preliminary
        Injunction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

        1.   The FTC Needs to Demonstrate Only Likely Success on the Merits and a
            Tipping of the Balance of the Equities. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

        2.   The FTC is Likely to Succeed in Showing that Defendant's Deceptive Websites
            Violate Sections 5(a) and 12 of the FTC Act. . . . . . . . . . . . . . . . . . . . . . . .  14

            a.   Defendant's Fake News Reports Contain Deceptive Misrepresentations
                in Violation of Section 5(a) of the FTC Act. . . . . . . . . . . . . . . . . . .  16

            b.   Defendant's Failure to Disclose, or Adequately Disclose, His Connection
                to the Sellers of Products and Services Violates Section 5(a) of the FTC
                Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

            c.   Defendant's Website Contains False and Unsubstantiated Weight Loss
                Claims in Violation of Section 5(a) and 12 of the FTC Act. . . . . . . . .  18

        3.   The Balance Of The Equities Weighs Heavily in Favor of the Requested
            Injunctive Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

        4.     A TRO Is Necessary To Halt Ongoing Fraud and Prevent Future Consumer Injury. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

             a.     The Preservation and Accounting of Assets are Necessary. . . . . . . . . 21

             b.     Limited Expedited Discovery and Other Ancillary Relief are Appropriate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

V.       CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## I. **INTRODUCTION**

Plaintiff, Federal Trade Commission ("FTC"), moves this Court for a Temporary Restraining Order ("TRO") to halt ongoing consumer harm caused by Defendant Tanner Garret Vaughn's fake news websites, which deceptively advertise bogus weight loss supplements and other products or services sold by third-party online merchants who compensate Defendant for his misrepresentations. The FTC brings this action under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), and Fed. R. Civ. P. 65(b).   This Memorandum and its exhibits support the FTC's motion.  **Immediately after filing the TRO pleadings, the FTC will commence efforts to notify Defendant of the FTC's request for entry of a TRO and of any TRO hearing subsequently scheduled by this Court.**

## II. **THE PARTIES**

### A. **Plaintiff Federal Trade Commission**

The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits deceptive acts or practices in or affecting commerce, and Section 12 of the FTC Act, 15 U.S.C. § 52, which bars false advertisements for food, drugs, devices, services, or cosmetics in or affecting commerce.  The FTC may initiate district court proceedings to enjoin violations of the FTC Act and secure other equitable relief including restitution and disgorgement.  15 U.S.C. §§ 53(b) and 56(a)(2)(A).

### B. **Defendant Tanner Garret Vaughn**

Defendant Tanner Garrett Vaughn deceptively advertises products and services through at least two fake news websites:  BreakingNewsat6.com, which has advertised acai berry supplements, colon cleansers, and other weight loss products containing hoodia[1] or HCG;[2] and Channel9NewsReport.com,

---

[1]  The merchant site selling "Pure Hoodia Select" states that hoodia is a "succulent herb" from Africa, where "the San Bushmen natives" use it to "curb their hunger and thirst during nomadic hunting trips."  Plaintiff's TRO Exhibit ("TRO Exh.") 1, p. 105.

[2]  HCG is an acronym for "human chorionic gonadotropin," which is sold in supplement form by the "hCG Activator" website most recently promoted by Defendant on BreakingNewsat6.com.  The merchant site states that HCG "allows the body to burn excess bodyfat [sic] by using that fat as a food source."  TRO Exh. 1, p. 120.

FEDERAL TRADE COMMISSION
915 Second Ave., Su. 2896
Seattle, Washington 98174
(206) 220-6350

which promotes an online surplus, or "penny" auction.[3]  He receives compensation to advertise these items, which are actually sold to consumers by third party merchants to whose websites Defendant provides links from his own sites.

Defendant conducts business under his own name and two corporate names, Lead Expose, Inc., and Uptown Media, Inc.  Defendant has served as vice president of Lead Expose, a defunct West Virginia company that he helped to incorporate in 2008.[4]  Uptown Media, Inc., is an inactive Washington company,[5] but it continues to be identified as the "owner" of Defendant's websites.[6]

### III.    DEFENDANT'S DECEPTIVE ADVERTISING PRACTICES

#### A.    Background on Affiliate Marketing

Defendant functions as an "affiliate marketer," or "affiliate," of the seller as they work together to defraud consumers.[7]  His fake news sites provide the bait to lure consumers to merchants' websites that deceptively sell weight loss supplements or other items.  In exchange for driving Internet traffic to the sellers' sites, Defendant is compensated, either directly by the seller or by a third party representing the seller.[8]

Affiliates are not new in the world of Internet commerce.  Traditionally, an affiliate may have run banner advertisements on behalf of merchant websites.  Consumers who clicked on those banner

---

[3]  Channel9NewsReport.com claims that "BigDeal" and other auction sites it has promoted "get[] their items from warehouse closeouts, surplus auction, and liquidation clearance auctions," which allows them to undercut standard retail prices. TRO Exh. 1, p. 87.

[4]  Defendant registered the website www.leadexpose.com in April 2008 through domain registrar GoDaddy.com.  TRO Exh. 1, p. 2, ¶ 8; p. 19.  Although this site remains live and Defendant continues to use an email address associated with the company, *see* TRO Exh. 1, p. 204 (column headed "E-Mail"), the West Virginia Secretary of State revoked Lead Expose's corporate charter in November 2010.  TRO Exh. 1, p. 2, ¶ 6c; p. 14.

[5]  TRO Exh. 1, p. 2, ¶ 7; p. 17.

[6]  TRO Exh. 1, pp. 36, 46, 66, 80, 90, 104, 119.

[7]  The FTC also enforces against the sellers of these products and services, challenging claims about the efficacy of these items as well as the terms and conditions of purchasing them.  *See, e.g., FTC v. Jeremy Johnson*, No. 2:10-cv-02203 (D. Nev. filed Dec. 21, 2010); *FTC v. Central Coast Nutraceuticals, Inc.*, No. 10c-4931 (N.D. Ill. filed Aug. 5, 2010).

[8]  TRO Exh. 1, p. 1, ¶ 4.

FEDERAL TRADE COMMISSION
915 Second Ave., Su. 2896
Seattle, Washington 98174
(206) 220-6350

ads would be taken directly to the seller's site.[9]  Advertising by affiliate has since expanded to include full-blown, independent websites set up by affiliates themselves to attract consumers to a seller's site.[10] The affiliate creates the site and includes links that consumers may click on to reach the merchant website.[11]

The compensation for affiliates is typically a percentage of sales they generate ("cost per sale" or "cost per action"), or an affiliate may be paid for each click made by a consumer on one of the links to the merchant site ("cost-per-click").[12]  The affiliate pays an "ad network" that controls the advertising space on websites across the Internet, including the sites of major news publishers.[13]  The affiliate provides the ad content to the ad network.[14]  These are the ads consumers encounter online when they use Google or another Internet search engine and view the search results, or when they see a banner ad on a website and click on it.[15]

A number of affiliates who design their own sites favor the fake news story format, presenting purportedly independent "research" by an alleged "journalist" about the merchant's products or services.[16]  The "research" revealed by the "journalist" inevitably supports the affiliate's claims about the products or services, and the "news story" conveniently includes links to the merchant's website where those items may be purchased.  And, given the compelling monetary incentive for affiliates to drive traffic to sellers' websites, these fake news sites often contain more specific, and arguably more

---

[9]  TRO Exh. 1, p. 1, ¶ 5.

[10]  TRO Exh. 1, pp. 1-2, ¶ 5.

[11]  *Id.*

[12]  In both cases, the merchant, directly or through an intermediary, tracks the number of consumers who access their site via the affiliate's advertising or the number of consumer sales attributable to the affiliate's promotional efforts.  TRO Exh. 1, p. 1, ¶ 4.

[13]  TRO Exh. 2, p. 237, ¶ 2 (noting that Pulse 360 places ads on its clients' behalf on its network of websites with "high quality content and desirable demographics"); TRO Exh. 1, pp. 1-2, ¶ 5; p. 13.

[14]  TRO Exh. 2, pp. 237-38, ¶¶  2, 4h.

[15]  TRO Exh. 1, pp. 1-2, ¶ 5.

[16]  TRO Exh. 1, p. 8, ¶ 33; pp. 154-56 (citing results of Google search for the text used in the "news alerts" on Defendant's website, which yielded a long list of fake news sites).

deceive, product claims than those made on the merchant's own site.[17]

## B. Defendant's False and Fraudulent Advertising Practices

"*Acai Berry Diet Exposed: Miracle Diet or Scam?*" reads the headline on one version of BreakingNewsat6.com.[18]  Notwithstanding the conclusion reached by the purported journalist on the site, the answer to this question is clear: it's a scam.  The "news alert" that appears on BreakingNewsat6.com is not actually a news report.  The alleged journalist pictured on the site is not actually a journalist who tested the products promoted on the site.  The "comments" from customers that appear after the "news alert" are not actually comments written by real customers.  And last – but not least – Defendant's claims about the weight-loss properties of acai berry and other products he promotes on his fake news sites are not actually true.  They are false and unsubstantiated.

### 1. Deceptive Features of Defendant's Fake News Sites

#### a. Defendant's Affirmative Misrepresentations

Defendant operates at least two websites that use fake news reports, BreakingNewsat6.com and Channel9NewsReport.com, which he registered with domain name registrar GoDaddy.com on April 13, 2010, and June 6, 2010, respectively.[19]  Although they promote different goods and services – BreakingNewsat6.com advertises weight loss products and Channel9NewsReport.com promotes surplus, or "penny," auctions – both falsely convey that they are legitimate news websites.[20]

---

[17]   For example, on March 10, 2011, the "reporter" on BreakingNewsat6.com claimed that after daily use for four weeks of Acai Lipo and Max Cleanse Pro, she lost twenty five pounds, without any "special diet" or "intense exercise."  TRO Exh. 1, p. 78.  In contrast, claims made on the Acai Lipo-seller website, accessed through a link on BreakingNewsat6.com and captured the same day, were more general: "Melt Away Fat!  Feel and Look Thin All Year!"  TRO Exh. 1, p. 81.  Similarly, claims on the Max Cleanse Pro-seller website, also accessed through a link on BreakingNewsat6.com and captured on March 10, 2011, were less specific than the statements on Defendant's site: "Flush out Waste Products," "Get a Flatter + Firmer Body," "Boost Your Energy + Health levels," and "Reduce Excess Water Weight."  TRO Exh. 1, p. 84 (Mar. 10, 2010, capture of BreakingNewsat6.com and linked captures of Get Slim Acai and Get Slim Colon Cleanse websites); *see also* TRO Exh. 1, pp. 34, 37, 40.

[18]   TRO Exh. 1, pp. 33, 63.

[19]   *See* TRO Exh. 1, p. 3, ¶¶ 8c, d, f.  Defendant paid to keep private the registration information for both websites, so that using a public website registration search tool like WHOIS identifies the registrant of these sites as "Domains by Proxy."  TRO Exh. 1, p. 3, ¶ 8e.  However, GoDaddy.com records reveal that Defendant owns these websites and used his personal credit card to pay for their registration.  TRO Exh. 1, pp. 2-3, ¶¶ 8, 11; pp. 23-24, 27-30.

[20]   Defendant has also registered a number of other websites with suspicious domain names, including How-to-Get-White-Teeth.com and How-To-Cure-Wrinkles.com.  TRO Exh. 1, pp. 2-3, ¶ 8; pp. 21-22.  These sites do not use a fake news format and thus are not discussed here.

FEDERAL TRADE COMMISSION
915 Second Ave., Su. 2896
Seattle, Washington 98174
(206) 220-6350

The misrepresentations conveyed by these sites begin with their domain names, both of which incorporate "news" into their name and suggest they are the website for a particular news outlet. This false impression is reinforced by the sites' format. Prominent headings read "NEWS ALERTS" beside pictures of a globe and two individuals identified as investigative reporters. Below the fake masthead are links to "Home," "U.S.," "World," "Business," "Politics," "Entertainment," "Leisure," "Health," "Scitech," "Opinion," "Sports," "On Air," "Subscribe," "News," "Comments," and "Email."[21] Below is the story "headline," which is followed by the phrase "AS SEEN ON" and the logos of prominent news organizations, including ABC, Fox News, CBS, CNN, and MSNBC.[22] However, as Defendant concedes on Channel9NewsReport.com – albeit in small font at the bottom – the site "is in no way affiliated with any news source."[23]

The misleading impression that these websites are legitimate news sites is perpetuated by the images of alleged journalists responsible for the content on BreakingNewsat6.com and Channel9NewsReport.com. These photos appear at the top of these websites and beside the introductory paragraphs of the "articles" they contain. Defendant rotates between images of two such "reporters": "Johanna Stiles" and "Julia Miller." However, these are simply misappropriated photographs that appear across the Internet, used to promote an array of diet regimens, penny auctions, and other suspect products and services.[24]

The purported news reports that appear on BreakingNewsat6.com and Channel9NewsReport.com display deceptive content liberally copied from other websites, using

---

[21] TRO Exh. 1, p. 33. Clicking on most of these links takes the viewer to a third-party website, Newsvine.com, which, according to its homepage, is a news site affiliated with msnbc.com. TRO Exh. 1, p. 5, ¶ 21. This further reinforces the impression that Defendant's websites are legitimate news sites.

[22] *See, e.g.*, TRO Exh. 1, pp. 33, 63.

[23] TRO Exh. 1, pp. 46, 90. Similarly (if more generally), a statement at the bottom of the site BreakingNewsat6.com provides, "this page, and any page on this website, are not to be taken literally, or as a non-fiction story." *See, e.g.*, TRO Exh. 1, p. 36 (third paragraph of Terms and Conditions).

[24] "Julia" is actually French television reporter Melissa Theuriau, whose photo appears in Defendant's online advertisements and countless others. *See* Ian McIlwraith, *The face that launched a global ad scam*, Sydney Morning Herald (Sept. 18, 2010), http://www.stuff.co.nz/technology/digital-living/4138888/ (noting that Theuriau's image has been "stolen for use in bogus advertising . . . to variously promote Swipe penny auctions, acai berry diets, colon cleansing and slimming teas"). An Internet search for images of both Ms. Theuriau and the woman identified as "Johanna Stiles" confirms this. TRO Exh. 1, pp. 7-8, ¶¶ 31-32; pp. 148-51.

FEDERAL TRADE COMMISSION
915 Second Ave., Su. 2896
Seattle, Washington 98174
(206) 220-6350

substantially identical language.[25]  Comparing the reports featured on various iterations of each site reveals that they are rote recitations of the same unsubstantiated claims about the efficacy of acai berry, colon cleansers, hoodia, HCG supplements, caffeine-based products (BreakingNewsat6.com), or penny auctions (Channel9NewsReport.com).  For example, a version of BreakingNewsat6.com captured in January 2011 describes how reporter Johanna Stiles, after using "Slim Acai" in combination with "Get Slim Colon Cleanse," lost twenty five pounds in four weeks without any special diet or intense exercise.[26]  This precise claim is also made on a version of this site captured on March 10, 2011, about two completely different products, "Acai Lipo" and "Max Cleanse Pro."[27]  The verbiage is nearly identical, here and in a subsequent version of BreakingNewsat6.com, captured on March 17, 2011, when Defendant switched to promoting a hoodia product instead of an acai berry one:[28]  journalist Julia claims she lost twenty five pounds in four weeks "with No Special Diet, No Intense Exercise"![29]  And, even more recently, when Defendant began advertising two different weight loss products on BreakingNewsat6.com, "hCG Activator" and "South Beach Java," he retained almost all of the content and the same claims, although these products appear to contain very different ingredients.[30]

The  "comments" that appear at the bottom of Defendant's fake news sites follow the same pattern.  These alleged consumer testimonials are not opinions of independent consumers, but merely additional (deceptive) advertising content.  An Internet search for the consumer names and phrases used in the alleged comments shows that these statements, including the same grammatical and typographical mistakes, appear on Defendant's as well as numerous other fake news sites promoting

---

[25]   TRO Exh. 1, pp. 8-10, ¶¶ 33-40; pp. 157-75, 180-203 (describing search results for key phrases used on BreakingNewsat6.com and Channel9NewsReport.com that show the same language appearing on several other websites promoting similar products and services).

[26]   TRO Exh. 1, pp. 64-65.

[27]   TRO Exh 1, p. 4, ¶ 16; p. 78.

[28]   TRO Exh. 1, pp. 101-02; *compare* pp. 77-78 (captured a week earlier).

[29]   TRO Exh. 1, p. 102; *compare* TRO Exh. 1, pp. 77-78, *with* TRO Exh. 1, pp. 101-02.

[30]   *Compare* TRO Exh. 1, p. 124 (listing ingredients of HCG product advertised by Defendant) *with* TRO Exh 1, p. 82 (identifying contents of "Acai Lipo" supplements previously promoted by Defendant).

FEDERAL TRADE COMMISSION
915 Second Ave., Su. 2896
Seattle, Washington 98174
(206) 220-6350

1   acai berry and other weight loss products.[31]  Equally suspiciously, the same consumer names are

2   associated with comments on BreakingNewsat6.com, Channel9News.com, and many other fake news

3   sites.[32]  In addition, the content of the alleged consumer comments does not change with the type of

4   product, simply substituting, for example, "hoodia" for "acai berry" on BreakingNewsat6.com and

5   "BigDeal" for "xBids" on Channel9NewReport.com.[33]  And, regardless of the product promoted and

6   the date, the same number of comments – 177 – is always referenced.[34]

7                           b.    Defendant's Failures to Disclose

8            As noted above, Defendant acknowledges that his fake news sites are not what they purport to

9   be.[35]  BreakingNewsat6.com and Channel9NewsReport.com feature the word "Advertorial" at the top

10  in font that is smaller than the surrounding text and images, which claim the sites provide "NEWS

11  ALERTS" for "News6" or "News9." [36]  The term "advertorial" is not defined and is spatially separated

12  from the purported news reports.  It therefore does not even remain visible to consumers as they scroll

13  down to read the fake news story and subsequent consumer "comments."

14           At the very bottom of the sites, in even smaller print, Defendant makes additional "disclosures"

15  about the nature of the sites:

16                    It is important to note that this site and the comments/answers depicted above is
                      to be used as an illustrative example of what some individuals have achieved
17                    with this/these products.  This website, and any page on the website, is based

18  _____

19       [31]  TRO Exh. 1, pp. 6-7, ¶¶ 24-30; *compare* TRO Exh. 1, pp. 35-36, 65-66, 79-80, 103-04 (captures of
     Defendant's sites) *with* TRO Exh. 1, pp. 130-31, 134, 137-38, 142-43 (other fake news sites).

20       [32]  *Compare, e.g.*, TRO Exh. 1, pp. 103-04 (Mar. 17, 2011, capture of BreakingNewsat6.com), *and* TRO
     Exh. 1, pp. 89-90 (Mar. 10, 2011, capture of Channel9NewsReport.com), *with* TRO Exh. 1, pp. 130-31, 134, 137-38,
21   142-43 (other fake news sites).

22       [33]  *Compare* TRO Exh. 1, pp. 103-04 (Mar. 17, 2011, capture of BreakingNewsat6.com, advertising "Pure
     Hoodia Select" and "Max Cleanse Pro" ), *with* TRO Exh. 1, pp. 65-66 (Jan. 12, 2011, capture of
23   BreakingNewsat6.com, advertising "Slim Acai" and "Get Slim Colon Cleanse");  *compare* TRO Exh. 1, pp. 89–90
     (Mar. 10, 2011, capture of Channel9NewsReport.com, advertising "BigDeal") *with* TRO Exh. 1, pp. 45-46 (Jan. 5,
24   2011, capture of Channel9NewsReport.com, advertising "xBids").

25       [34]  *See, e.g.*, TRO Exh. 1, p. 45 (Jan. 5, 2011, capture of Channel9NewsReport.com, referencing 177
     comments); TRO Exh. 1, p. 65 (Jan. 12, 2011, capture of BreakingNewsat6.com, referencing 177 comments); TRO
26   Exh. 1, p. 89 (Mar. 10, 2011, capture of Channel9NewsReport.com, referencing 177 comments); TRO Exh. 1, p. 103
     (Mar. 17, 2011, capture of BreakingNewsat6.com, referencing 177 comments).

27       [35]  *See supra* note 23 and accompanying text.

28       [36]  *See, e.g.*, TRO Exh. 1, p. 77 (capture of BreakingNewsat6.com); TRO Exh. 1, p. 87 (capture of
     Channel9NewsReport.com).

FEDERAL TRADE COMMISSION
915 Second Ave., Su. 2896
Seattle, Washington 98174
(206) 220-6350

loosely off a true story, but has been modified in multiple ways including, but not limited to: the story, the photos, and the comments.  Thus, this page, and any page on this website, are not to be taken literally or as a non-fiction story.  This page, and the results mentioned on this page, although achievable for some, are not to be construed as the results that you may achieve on the same routine.  I UNDERSTAND THIS WEBSITE IS ONLY ILLUSTRATIVE OF WHAT MIGHT BE ACHIEVABLE FROM USING THIS/THESE PRODUCTS, AND THAT THE STORY/COMMENTS DEPICTED ABOVE IS NOT TO BE TAKEN LITERALLY.  This page receives compensation for clicks on or purchase of products featured on this site.[37]

This information is at best confusing to consumers, but, most critically, it may not be seen at all by many viewers.  It is nearly illegible as it actually appears on the bottom of Defendant's sites:



Further, even if consumers read this, it does not adequately communicate that the website is not a news site, but rather an advertisement for products or services that the site owner receives compensation to promote.  While this language is evidence that Defendant knows his sites are misleading, it is not sufficient to cure Defendant's false representations.[38]

c.      Defendant's False and Unsubstantiated Weight Loss Claims

Defendant also makes false statements about the weight loss products themselves.  Most significantly, BreakingNewsat6.com contains the untrue and unsubstantiated claim that the featured "reporter," after using the prescribed amount of acai berry and colon cleanse products promoted on the site every day for a month, "**[l]ost 25 lbs in 4 weeks,  No Special Diet,  No Intense Exercise**."[39]

This statement is scientifically implausible.  To evaluate Defendant's claims about acai berry and colon cleanse products,[40] the FTC retained Dr. Edward R. Blonz, an expert in the fields of food,

---

[37]   *See, e.g.*, TRO Exh. 1, p. 80 (capture of Breaking Newsat6.com, third paragraph of Terms and Conditions); TRO Exh. 1, p. 90 (capture of Channel9NewsReport.com).

[38]   *See infra* pp. 17-18.

[39]   *See, e.g.*, TRO Exh. 1, p. 78.

[40]   As noted above, Defendant has marketed acai berry products under the names "Slim Acai" and "Acai Lipo" (collectively, "acai berry products") and colon cleanse products under the names "Get Slim Colon Cleanse" and "Max Pro Cleanse" (collectively, "colon cleanse products").  *See, e.g.*, TRO Exh. 1, pp. 77-86 (Mar. 10, 2011, capture of BreakingNewsat6.com).  His foray into hoodia supplements and, most recently, "hCG Activator" and "South Beach Java," came too late for Dr. Blonz to obtain the products and analyze their ingredients.

FEDERAL TRADE COMMISSION
915 Second Ave., Su. 2896
Seattle, Washington 98174
(206) 220-6350

nutrition and dietary supplements and their impact on health.[41]  After reviewing the applicable scientific literature as well as the contents of acai berry and colon cleanse products advertised by Defendant, Dr. Blonz concluded that "any statement that any level of intake of [the Products] or both Products, whether taken individually or in combination, can result in the claimed rate of weight loss without dieting or intense exercise is false."[42]

In support of his findings, Dr. Blonz analyzed the ingredients in an acai berry product purchased through a link on BreakingNewsat6.com and concluded that "[t]here is not one study in the scientific literature reporting any effect of the acai berry or an acai berry extract, on weight loss in humans."[43]  He reached a similar conclusion after examining the contents of the Max Cleanse Pro supplements purchased through a link on Defendant's site,[44] stating that "[a]ny statement that [Max Cleanse Pro], when taken by itself or in combination with other ingredients in The Products, can bring about the claimed rate of weight loss is false and unsubstantiated in the scientific literature."[45]  As to the purported consumer comments on BreakingNewsat6.com that tout the results of using acai berry and colon cleanse products, Dr. Blonz states that "[t]estimonials from consumers do not constitute scientific evidence of product efficacy."[46]

Dr. Blonz placed Defendant's weight loss claims in context by analyzing the caloric requirements necessary for an average-sized adult to lose twenty five pounds in four weeks. According to his calculations, he or she would have to take in 3,125 fewer calories per day to accomplish this rate of weight loss.[47]  To achieve this caloric "deficit," a 200-pound person would have

---

[41]  TRO Exh. 3, p. 241, ¶ 1.

[42]  TRO Exh. 3, p. 243, ¶ 4.

[43]  TRO Exh. 3, pp. 246-47, ¶ 16.  Dr. Blonz analyzed a product called "Acai Reduce," which was received after placing an order on the "Acai Lipo" merchant site.  Promptly after it arrived, FTC staff sent the package, unopened, directly to Dr. Blonz.  *See* TRO Exh. 1, p. 4, ¶¶ 14-15; pp. 73-76.

[44]  After the box containing the Max Cleanse Pro supplements arrived, FTC staff shipped it to Dr. Blonz. TRO Exh. 1, p. 5, ¶ 19; pp. 111-15.

[45]  TRO Exh. 3, p. 256, ¶ 40.

[46]  TRO Exh. 3, p. 264, ¶ 58.

[47]  TRO Exh. 3, p. 260, ¶ 51c.

FEDERAL TRADE COMMISSION
915 Second Ave., Su. 2896
Seattle, Washington 98174
(206) 220-6350

to undertake an extraordinary, if not impossible, exercise regimen: he or she would have to run an estimated twenty five miles per day, in addition to his or her regular daily activities.[48]  Put another way, "even under conditions of a complete starvation fast, where no calories are consumed, the reported loss of body weight over the long term occurs at a rate of only 0.66 pounds (2,310 calories) per day."[49]  Accordingly, Dr. Blonz concluded that the amount and rate of weight loss claimed on BreakingNewsat6.com is "clearly outside the realm of plausible science."[50]

### 2.  Defendant's Aggressive Marketing Techniques

In addition to advertising on behalf of merchants selling weight loss and penny auction programs, Defendant also secures advertising to drive traffic to his own websites.  Like other affiliate marketers (and other advertisers), Defendant works with a third-party advertising network, which operates as a middleman between high-volume websites that carry ads and advertisers like Defendant that want to place such ads.[51]  As discussed above, consumers may encounter a banner ad for an affiliate marketer's website either as part of Internet search results or by viewing an advertisement placed on a website.[52]  This advertising is the principal way that consumers find and view Defendant's fake news sites.

According to data produced to the FTC by ad network Pulse 360, Defendant has personally invested more than $219,000 to have Pulse 360 place ads for websites.[53]  Of that amount, more than half – $125,000 – was spent very recently, in just January and February of this year.[54]  Using

---

[48]  TRO Exh. 3, p.  260, ¶ 51d.

[49]  TRO Exh. 3, pp. 260-61, ¶ 51e.

[50]  TRO Exh. 3, p. 261, ¶ 51f.

[51]  *See supra* note 13 and surrounding text; *see also* TRO Exh. 1, pp. 1-2; ¶¶ 4-5; TRO Exh. 2, pp. 237-39, ¶¶ 2, 4-5.

[52]  *See supra* note 14 and surrounding text; *see also* TRO Exh. 1, pp. 1-2, ¶5.

[53]  TRO Exh. 1, p. 12, ¶ 44.  However, as noted above, see *supra* note 20, Defendant operates several websites, and the money Defendant has paid to Pulse 360 has not funded advertising only for BreakingNewsat6.com and Channel9NewsReport.com.  Client payments to Pulse 360 are deposited into what functions like an escrow account, which Pulse 360 can later draw upon to fund ads the client requests be placed.  *See* TRO Exh. 2, p. 239, ¶ 4o (defining "Revenue"), ¶ 5b (defining "Amount").  As a result, the FTC cannot yet link Defendant's Pulse 360 payments to specific ads placed for his fake news sites.

[54]  This is the most recent data produced to the FTC by Pulse 360.  TRO Exh. 1, p. 12, ¶ 44.

Motion for TRO and Supporting Memorandum      10

1   Defendant's payments, between June and August 2010, Pulse 360 placed more than 41 million

2   "impressions" of ads for BreakingNewsat6.com on its network of websites, which represents the

3   number of times that consumers could have viewed advertising for this site.[55]  Pulse 360 also placed

4   nearly 347 million impressions of ads for Channel9NewsReport.com between June and September

5   2010.[56]  Defendant provided the text and images to Pulse 360 to be used for such impressions.[57]

6          As a result of these impressions, consumers actually clicked on ads for BreakingNewsat6.com,

7   taking them directly to the site, more than 16,100 times in just June through August 2010.[58]  And from

8   June through September 2010, consumers clicked on ads for Channel9NewsReport.com and were

9   taken to the site on more than 70,700 occasions.[59]  Although this data does not establish how many

10  consumers then clicked on a link to a merchant website embedded in one of Defendant's fake news

11  sites and purchased a product or service, it is a reasonable proxy for how many consumers viewed

12  Defendant's deceptive representations and may have relied upon them to their detriment.

13  **IV.   ARGUMENT**

14         The FTC has successfully brought actions to halt bogus weight loss and other advertising

15  scams like the one challenged here.[60]  As in these earlier cases, Defendant's affiliate marketing tactics

16  are deceptive and violate Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.  The FTC

17  seeks a preliminary injunction and other equitable relief to redress the consumer injury that has been

18

19     [55]  TRO Exh. 1, p. 11, ¶ 42a; pp. 204-05 (column headed "Impressions"; total figure on p. 205); TRO Exh.
20  2, p. 239, ¶ 4m  (defining the term "Impressions").

21     [56]  TRO Exh. 1, p. 11, ¶ 43a; pp. 218-33 (column headed "Impressions"; total figure on p. 233).

22     [57]  *See* TRO Exh 2, p. 237, ¶ 2) (explaining that "the advertiser selects the text and images used in the ads
    that appear with each impression").

23     [58]  TRO Exh. 1, p. 12, ¶ 42b; pp. 204-05 (column headed "Clicks"; total figure on p. 205); TRO Exh. 2, p.
24  239, ¶ 4n (defining the term "Clicks").

25     [59]  TRO Exh. 1, p. 11, ¶ 43b; pp. 218-33 (column headed "Clicks"; total figure on p. 233).

26     [60]  *See, e.g., FTC v. Medlab, Inc.*, 615 F. Supp. 2d 1068 (N.D. Cal. 2009) (permanent injunction issued in
    connection with "The New Skinny Pill," a supplement which defendants claimed could cause rapid and substantial
    weight loss without diet or exercise); *FTC v. Nat'l Urological Grp., Inc.,* 2008 U.S. Dist. LEXIS 44145, 2008-1
27  Trade Cas. (CCH) ¶ 76,183 (N.D. Ga. 2008) (preliminary and permanent injunction issued in connection with
    weight loss supplement scheme); *FTC v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263 (S.D. Fla. 1999) (TRO,
28  preliminary, and permanent injunction issued in connection with the sale of weight loss program); *FTC v. Pac. Med.
    Clinics Mgmt., Inc.*, 1992-1 Trade Cas. (CCH) ¶ 69,777 (S.D. Cal. 1992) (preliminary and permanent injunction
    issued in connection with weight loss program featuring tablets promised to "burn fat").

FEDERAL TRADE COMMISSION
915 Second Ave., Su. 2896
Seattle, Washington 98174
(206) 220-6350

caused, and will continue to be caused, by Defendant's deceptive and illegal practices.  To prevent Defendant from committing further violations pending resolution of this action and to prevent further harm to consumers, the FTC also seeks a TRO that would immediately halt Defendant's deceptive marketing practices.

Section A, below, sets forth the FTC's authority to seek, and this Court's authority to grant, temporary and preliminary injunctive relief in this law enforcement action.  Section B describes how the FTC's evidence meets the standard for issuing a preliminary injunction in a government enforcement action.  Finally, Section C explains why the requested ancillary relief – asset preservation, an accounting of assets, and limited expedited discovery – is necessary to secure disgorgement and potentially to provide redress to injured consumers.

**A.    Section 13(b) of the FTC Act Authorizes the Requested Injunctive Relief.**

This Court has authority to grant the requested temporary and preliminary injunctive relief pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b); 28 U.S.C. § 1651(a); and Fed. R. Civ. P. 65(b).  Section 13(b) of the FTC Act specifically authorizes a district court to grant permanent injunctions to enjoin violations of the FTC Act in "proper cases,"[61] including any matter involving a violation of a law the FTC enforces.[62]  A fraud case such as this one, replete with misrepresentations of material facts in violation of Sections 5(a) and 12 of the FTC Act, clearly qualifies as a "proper case" for injunctive relief under Section 13(b).[63]  Injunctive relief is appropriate even if a defendant has ceased its illegal activities if there is "cognizable danger of recurrent violation."[64]  The commission of

---

[61]   The FTC proceeds here, as in *FTC v. H.N. Singer*, 668 F.2d 1107 (9th Cir. 1982), under the second proviso of Section 13(b).  Cases brought under this proviso are not subject to the conditions set forth in the first proviso of Section 13(b) for the issuance of preliminary injunctions in aid of administrative proceedings.  *Singer*, 668 F.2d at 1111 (routine fraud cases may be brought under second proviso, without being conditioned on first proviso requirement that the FTC institute an administrative proceeding); *FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1434 (11th Cir. 1984) ("Congress did not limit the court's powers under the [second and] final proviso of [Section] 13(b)").

[62]   *FTC v. Evans Products Co.*, 775 F.2d 1084, 1086-87 (9th Cir. 1985); *Singer*, 668 F.2d at 1113; *FTC v. Pac. Med. Clinics Mgmt, Inc.*, 1992-1 Trade Cas. (CCH) ¶ 69,777 at 67,587 (S.D. Cal. 1992).

[63]   *Singer*, 668 F.2d at 1111; *see SlimAmerica*, 77 F. Supp. 2d at 1275.

[64]   *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953).

FEDERAL TRADE COMMISSION
915 Second Ave., Su. 2896
Seattle, Washington 98174
(206) 220-6350

1   past illegal conduct is "highly suggestive of the likelihood of future violations."[65]  In actions under

2   Section 13(b), the district court may exercise the full breadth of its equitable authority, imposing

3   additional relief such as consumer restitution if necessary to accomplish complete justice.[66]  Incident to

4   its authority to issue permanent injunctive relief, this Court has the inherent equitable power to grant

5   all preliminary relief necessary to effectuate ultimate relief.[67]  This Court's exercise of its broad

6   equitable authority is particularly appropriate where, as here, the public interest is at stake.[68]

7           As set forth in this memorandum and the accompanying exhibits, the FTC's evidence satisfies

8   the two-prong test required for entry of the TRO, preliminary injunction, and ancillary relief requested.

9   First, there is a substantial likelihood that the FTC will ultimately succeed in showing that the

10  Defendant's affiliate marketing scheme violates Sections 5(a) and 12 of the FTC Act.  Second, public

11  equities weigh heavily in favor of granting the requested preliminary relief because illegal deception is

12  central to Defendant's affiliate marketing scheme and because, as Defendant's recent actions have

13  demonstrated, the fake news format is flexible and may be easily modified to market a variety of

14  different products and services.

15      **B.**     **The FTC's Evidence Satisfies the Standard for Entry of a TRO and Preliminary
              Injunction**.

16          **1.**     **The FTC Needs to Demonstrate Only Likely Success on the Merits and a
                      Tipping of the Balance of the Equities**.

17

18          To obtain a TRO and preliminary injunction, the FTC must show: (1) likelihood of ultimate

19  success on the merits of the present action and (2) equities that weigh in favor of granting such relief.[69]

20   In contrast to private litigation, in statutory enforcement actions where the government has shown

21

22      [65]  *CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979); *see also FTC v. Direct Mktg. Concepts, Inc.*, 648 F.
    Supp. 2d 202, 212 (D. Mass. 2009), *aff'd*, 624 F.3d 1 (1st Cir. 2010); *FTC v. Think Achievement Corp.*, 144 F. Supp.
23  2d 1013, 1017 (N.D. Ind. 2000); *FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502, 536 (S.D.N.Y. 2000).

24      [66]  *FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 348 (9th Cir. 1989) (affirming district court's power to
    freeze assets, provide consumer redress, and appoint a receiver); *Singer*, 668 F.2d at 1114 (preliminary injunction
25  with asset freeze affirmed).

26      [67]  *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1102 (9th Cir. 1994), *cert. denied*, 514 U.S. 1083 (1995); *FTC v.
    Amy Travel Serv., Inc.*, 875 F.2d 564, 572 (7th Cir. 1989), *cert. denied*, 493 U.S. 954 (1989); *Singer*, 668 F.2d at
27  1113.

28      [68]  *See Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946); *World Wide Factors*, 882 F.2d at 347.

    [69]  *World Wide Factors*, 882 F.2d at 346.

FEDERAL TRADE COMMISSION
915 Second Ave., Su. 2896
Seattle, Washington 98174
(206) 220-6350

likelihood of success on the merits, the usual prerequisite of irreparable injury is presumed and therefore need not be proved.[70]  Because irreparable injury is presumed, the FTC need only demonstrate "some chance of probable success on the merits."[71]  The FTC proceeds here "not as an ordinary litigant, but as a statutory guardian charged with safeguarding the public interest."[72]  When a court balances the equities, the public interest "should receive greater weight" than any private concerns.[73]

### 2.  The FTC is Likely to Succeed in Showing that Defendant's Deceptive Websites Violate Sections 5(a) and 12 of the FTC Act.

The success of Defendant's deceptive advertising scheme depends on luring as many consumers as possible to click on links to merchant websites.  To do so, Defendant has designed his websites to create the impression that they are objective news reports.  Defendant fails to adequately disclose that his fake news sites are actually advertisements, and that Defendant receives commissions from merchants for sales directed from these websites.  Moreover, on his BreakingNewsat6.com website, Defendant claims that acai berry and colon cleanse products are effective in achieving rapid and significant weight loss results, claims that are false and unsubstantiated.  These material misrepresentations are deceptive acts or practices in violation of Sections 5(a) and 12 of the FTC Act.

Section 5(a) of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce."  Section 12 of the FTC Act, 15 U.S.C. § 52, prohibits the dissemination of any false advertisement in or affecting commerce "for the purpose of inducing, or which is likely to induce, directly or indirectly the purchase of food, drugs, devices, services, or cosmetics."[74]  For the purposes of Section 12 of the FTC Act, 15 U.S.C. § 52, the acai berry and colon cleanse products are either a food or a drug, as defined in Sections 15(a), (c), and (d) of the FTC Act, 15 U.S.C. § 55(a), (c), and

---

[70]  *Id.* at 346; *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1233 (9th Cir. 1999); *see also United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 175 (9th Cir. 1987) (where injunction is authorized by statute, enforcing agency need not show irreparable injury).

[71]  *Odessa Union*, 883 F.2d at 176.

[72]  *See SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975).

[73]  *Affordable Media*, 179 F.3d at 1236 (quoting *World Wide Factors*, 882 F.2d at 347).

[74]  15 U.S.C. § 52.  For purposes of Section 12, a false advertisement is defined as "an advertisement, other than labeling, which is misleading in a material respect."  15 U.S.C. § 55.

FEDERAL TRADE COMMISSION
915 Second Ave., Su. 2896
Seattle, Washington 98174
(206) 220-6350

(d).[75]  A violation of Section 12 constitutes a violation of Section 5(a).[76]  Thus, to prevail under Sections 5(a) and 12 as to Defendant's advertisements, the FTC need establish only that: (1) the Defendant made a representation or omission or engaged in a practice; (2) the representation, omission or practice is likely to mislead consumers acting reasonably under the circumstances; and (3) the representation, omission, or practice is material to the consumer's decision to purchase the product.[77] The FTC need not prove, however, that the Defendant intended to deceive consumers or acted in bad faith.[78]  Moreover, proof of actual consumer injury is not required.[79]

In deciding whether an advertiser made certain claims, a court must first review the advertisement to determine what representations it conveys.[80]  A claim is deemed made if consumers, acting reasonably under the circumstances, would interpret the statements to contain that message.[81] In determining whether an advertiser's representation is likely to mislead consumers, courts are required to consider the overall, net impression.[82]  "A determination of false advertising can be based

---

[75]  *See SlimAmerica*, 77 F. Supp. 2d at 1272 (supplement marketed as weight loss pill constitutes "food" and/or "drugs" for purposes of Section 12).

[76]  15 U.S.C. § 52(b); *see also FTC v. QT, Inc.*, 448 F. Supp. 2d 908, 957 (N.D. Ill. 2006), *aff'd as amended*, 512 F.3d 858 (7th Cir. 2008).

[77]  *FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009) (Section 5(a)); *FTC v. Cyberspace.com, LLC*, 453 F.3d 1196, 1199-1200 (9th Cir. 2006) (Section 5(a)); *FTC v. Gill*, 265 F.3d 944, 950 (9th Cir. 2001) (Section 5(a)); *Pantron*, 33 F.3d at 1095 (Sections 5(a) and 12); *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003) (Sections 5(a) and 12), *reh'g denied en banc*, 66 F.App'x 848 (11th Cir. 2003).

[78]  *FTC v. World Travel Vacation Brokers Inc.*, 861 F.2d 1020, 1029 (7th Cir. 1988); *Beneficial Corp. v. FTC*, 542 F.2d 611, 617 (3d Cir. 1976), *cert. denied*, 430 U.S. 983 (1977).

[79]  *Kraft, Inc.*, 114 F.T.C. 40, 134 (1991), *order enf'd*, 970 F.2d 311 (1992), *cert. denied*, 507 U.S. 909 (1993).

[80]  *See FTC v. Gill*, 71 F. Supp. 2d 1030, 1043-44 (C.D. Cal. 1999), *aff'd*, 265 F.3d 944 (9th Cir. 2001); *see also SlimAmerica, Inc.*, 77 F. Supp. 2d at 1272-74 (finding that advertisements conveyed weight loss claims).

[81]  *Kraft*, 114 F.T.C. at 120.

[82]  *Stefanchik*, 559 F.3d at 928; *FTC v. Cyberspace.com, LLC*, 453 F.3d at 1200 ("[a] solicitation may be likely to mislead by virtue of the net impression it creates" even if it contains truthful disclosures), *aff'd*, 195 F.App'x 544 (9th Cir. 2006).  To judge the tendency of advertising to deceive, it must be viewed as a whole, without emphasizing isolated words or phrases apart from their context.  *Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1496 (1st Cir. 1989).

Motion for TRO and Supporting Memorandum     15

1 upon deceptive visual representations."[83]  A representation is likely to mislead consumers if it is

2 false.[84]  A representation that lacks a reasonable basis is also considered false.[85]

3        A misleading representation "is material if it 'involves information that is important to

4 consumers and, hence, likely to affect their choice of, or conduct regarding, a product.'"[86]  Three types

5 of claims are presumed material: (1) express claims;[87] (2) implied claims where there is evidence that

6 the seller intended to make the claim;[88] and (3) claims that significantly involve health, safety, or other

7 issues that would concern reasonable consumers.[89]  A finding of deception normally also justifies an

8 inference of materiality.[90]

9      a.    <u>Defendant's Fake News Reports Contain Deceptive Misrepresentations in Violation of Section 5(a) of the FTC Act.</u>

10        To persuade consumers to click on links to the sellers' websites, Defendant's Internet

11 advertisements use a combination of express and conspicuous statements and depictions that give

12 consumers the net impression that Defendant's websites are objective news reports.  At Defendant's

13 fake news websites, consumers see fake mastheads, news logos and pictures of news reporters, the

14 results of fake news "investigations" conducted by fictional journalists, and fake consumer

15 "comments."  Because these representations are false, they are likely to mislead consumers.

16

17 _____

18    [83]  *Sterling Drug, Inc. v. FTC*, 741 F.2d 1146, 1152 (9th Cir. 1984), *cert. denied*, 470 U.S. 1084 (1985).

19    [84]  *Pantron*, 33 F.3d at 1096 & n.22; *see QT, Inc.*, 448 F. Supp. 2d at 957-58.

20    [85]  *Pantron*, 33 F.3d at 1096 & n.22; *see QT, Inc.*, 448 F. Supp. 2d at 957-58; *see also FTC Policy*

21 *Statement on Deception* (appended to *Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 175 n.4 (1984)); *Tashman*, 318 F.3d at 1277; *FTC v. US Sales Corp.*, 785 F. Supp. 737, 748 (N.D. Ill. 1992) ("Apart from challenging the truthfulness of an advertiser's representations, the FTC may challenge the representation as unsubstantiated if the advertiser lacked a

22 reasonable basis for its claims").

23    [86]  *Cyberspace.com*, 453 F.3d at 1201 (quoting *Cliffdale Assocs.*, 103 F.T.C. at 165).

24    [87]  *Pantron*, 33 F.3d at 1095-96.

25    [88]  The presumption of materiality for intentional implied claims has been accepted by circuit courts.  *See, e.g., Novartis Corp. v. FTC*, 223 F.3d 783, 786-87 (D.C. Cir. 2000); *Kraft, Inc. v. FTC*, 970 F.2d 311, 322 (7th Cir.

26 1992), *cert. denied*, 507 U.S. 909 (1993); *cf. FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 604 (9th Cir. 1993) (no loophole for implied deceptive claims), *cert. denied*, 510 U.S. 1110 (1994).

27    [89]  *Kraft*, 970 F.2d at 322-23 (deceptive health claims are material).

28    [90]  *FTC v. Colgate-Palmolive*, 380 U.S. 374, 391-92 (1965); *Am. Home Products Corp. v. FTC*, 695 F.2d 681, 688 n.11 (3d Cir. 1982); *Simeon Mgmt. Corp. v. FTC*, 579 F.2d 1137, 1146 (9th Cir. 1978).

Motion for TRO and Supporting Memorandum    16

1   Defendant's misrepresentations are presumed material to consumers' decisions to purchase the

2   sellers' products and services because they are express or so strongly implied as to be "obvious."[91]

3   Even if Defendant's representations were only implied, they would still be presumed material because

4   Defendant intended to make them, as evidenced by his carefully designed website.  Moreover,

5   Defendant's representations on his BreakingNewsat6.com website relate to the purported health effects

6   of acai berry and colon cleanse products.  They are presumed material for that reason too.  Finally,

7   even if these facts do not give rise to a presumption of materiality, an objective news report's ringing

8   endorsement is clearly material to a consumer's decision to purchase the product or service or not.

9          b.   <u>Defendant's Failure to Disclose, or Adequately Disclose, His Connection
                to the Sellers of Products and Services Violates Section 5(a) of the FTC</u>

10              <u>Act.</u>

11         An advertisement is deceptive in violation of Section 5(a) of the FTC Act "if it fails to disclose

12  facts necessary to dissipate false assumptions likely to arise in light of the representations actually

13  made."[92]  An advertiser's failure to disclose material information may cause an advertisement to be

14  deceptive "even if it does not state false facts."[93]  Because the net impression determines whether a

15  practice is illegal under the FTC Act, to defeat liability, a disclaimer must be "sufficiently prominent

16  and unambiguous to change the apparent meaning of the claims and to leave an accurate impression."[94]

17  An inconspicuous disclosure, even if truthful, will not remedy a deceptive representation or

18  impression.[95]

---

19         [91]   *See Kraft*, 970 F.2d at 319.

20         [92]   *FTC v. Simeon Mgmt. Corp.*, 532 F.2d 708, 716 (9th Cir. 1976).

21         [93]   *Sterling*, 741 F.2d at 1154; *Simeon Mgmt. Corp.*, 579 F.2d at 1145.

22         [94]   *Removatron*, 884 F.2d at 1497.

23         [95]   *Cyberspace.com*, 453 F.3d at 1200 (reviewing cases where deception found because fine print
    disclosures inadequate to qualify claim or disclose material information); *FTC v. Direct Mktg. Concepts, Inc.*, 624
24  F.3d 1, 12 (1st Cir. 2010) ("[D]isclaimers or qualifications in any particular ad are not adequate to avoid liability
    unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and leave an
25  accurate impression.") (quoting *Removatron,* 884 F.2d at 1497); *FTC v. Brown & Williamson Tobacco Corp.*, 778
    F.2d 35, 43 (D.C. Cir. 1985) (advertisement's description of cigarette tar content deceptive despite fine print
26  disclosure at the bottom of the ad); *FTC v. Porter & Deitsch*, 605 F.2d 294, 301 (7th Cir. 1979) (upholding FTC
    finding that disclosures "buried in small print" were inadequate to qualify weight loss claims in advertising); *Gill*, 71
27  F. Supp. 2d at 1044 (disclaimers in contract for credit repair services insufficient to counteract advertising claims
    about the service); *Medlab*, 615 F. Supp. 2d at 1077 (disclosures appearing at the bottom of advertisement in
28  minuscule print insufficient to cure deceptive representations appearing in body of advertisement); *FTC v.
    Edebitpay, LLC*, No. CV-07-4480 ODW, 2011 U.S. Dist. LEXIS 15750, at *19-20 (C.D. Cal. Feb. 3, 2011)
    (defendants' disclosures in "small font in a footnote at the bottom of the webpage" or buried in hyperlinked terms

FEDERAL TRADE COMMISSION
915 Second Ave., Su. 2896
Seattle, Washington 98174
(206) 220-6350

Defendant here fails to disclose, or disclose adequately, that he was paid by merchants to advertise their products and services.  Defendant also fails to disclose, or disclose adequately, that his fake news sites are not associated with an independent news organization and not authored by an objective news reporter.  The small print word "Advertorial" at the top and an ineffective disclaimer buried in small print at the end are wholly inadequate to cure Defendant's websites of deception. Defendant's very small "Advertorial" label is overshadowed by the much larger fake news masthead and fake report headline.  The purported "disclosure" is in minuscule print and visible only to consumers who scroll to the very end of the fake news report, past the purported investigative report, the fabricated "comments" section, and several links to merchants' sites.  These purported disclaimers fail to neutralize the deceptive net impression left by Defendant's websites.

In Defendant's otherwise ineffective disclaimer, however, Defendant admits that: (1) the news sites are not objective news reports; (2) the "reporters" are fictional; (3) the "reporters" never conducted the tests or experienced the results described in the "reports"; (4) the "comments" following the "reports" are not independent statements from ordinary consumers; (5) the news "reports" are paid advertisements; and (6) Defendant is paid whenever a consumer clicks on or purchases a product or service he features.

> c.   Defendant's Website Contains False and Unsubstantiated Weight Loss Claims in Violation of Section 5(a) and 12 of the FTC Act.

The FTC is also likely to succeed here in showing that the weight loss claims Defendant makes in his BreakingNewsat6.com website violate Sections 5(a) and 12 of the FTC Act.  To show that an advertisement is likely to mislead consumers, the FTC may proceed under either a falsity theory or a failure to substantiate theory.[96]  To establish that an advertising claim is false, the FTC is not required to show that a product is "wholly ineffective," but rather that the product claims are materially misleading.[97]  To show that a claim is unsubstantiated, the FTC must show that Defendant lacked a

---

and conditions violated order requiring defendants to clearly and conspicuously disclose materials terms of marketing products and services).

[96]  *Pantron*, 33 F.3d at 1096 (citing *Thompson Med. Co.*, 104 F.T.C. 648, 818-19 (1984), *pet. for rev. denied*, 791 F.2d 189 (1986), *cert. denied*, 479 U.S. 1086 (1987)).

[97]  *Id.* at 1099-1100.

FEDERAL TRADE COMMISSION
915 Second Ave., Su. 2896
Seattle, Washington 98174
(206) 220-6350

1    reasonable basis for asserting that the claim was true.[98]  For an advertiser to have a "reasonable basis"

2    for a representation, it must have had substantiation for the representation prior to making it in an

3    advertisement.[99]  The necessary level of prior substantiation varies depending on the nature of the

4    representation.[100]  For health-related claims, in order to have a reasonable basis to make the claim at

5    issue, an advertiser must possess "competent and reliable scientific evidence" to substantiate the

6    claims.[101]  Courts have held that with medical, health-related claims, a well-conducted, placebo-

7    controlled, randomized, double-blind study constitutes competent and reliable scientific evidence.[102]

8         Here, Defendant has made both materially false and unsubstantiated claims on

9    BreakingNewsat6.com that the acai berry products, alone or in combination with the colon cleanse

10   products, cause rapid and substantial weight loss, enabling users to lose as much as twenty five pounds

11   in four weeks without the need to reduce caloric intake or increase physical activity.  As Dr. Blonz

12   makes clear, there is no scientific basis for Defendant's weight loss claims.[103]  These claims are

13   scientifically implausible.[104]  Moreover, there is no scientific research available that would

14   demonstrate that acai berry, alone or in combination with colon cleanse products, without diet and

---

17   [98]  *Id.* at 1096 (quoting *Thompson Med.*, 104 F.T.C. at 819); *QT, Inc.*, 448 F. Supp. 2d at 959.  A
     representation that lacks a reasonable basis is also considered false.  *FTC Policy Statement on Deception*; *see also*
18   *Tashman,* 318 F.3d at 1277; *FTC v. US Sales Corp*., 785 F. Supp. 737, 748 (N.D. Ill. 1992) ("the FTC may challenge
     [a] representation as unsubstantiated if the advertiser lacked a reasonable basis for its claims.") *op. modified on other*
19   *grounds*, No. 91-C-3893, 1992 WL 104819 (N.D. Ill. May 6, 1992).

20   [99]  *QT, Inc.*, 448 F. Supp. 2d at 959 ("Defendants have the burden of establishing what substantiation they
     relied on for their product claims."); *Thompson Med.*, 104 F.T.C. 648, app. at 839 (1984) (FTC Policy Statement
21   Regarding Advertising Substantiation, or "Policy Statement on Advertising Substantiation").

22   [100]  *Thompson Med.*, 104 F.T.C. at 819.

23   [101]  *See, e.g., Direct Mktg. Concepts*, 569 F. Supp. 2d at 300, 303-04 (requiring "competent and reliable
     scientific evidence" to substantiate efficacy claims of dietary supplement, including weight loss claims); *Nat'l*
24   *Urological Grp.*, 2008 U.S. Dist. LEXIS 44145 at *43-44 (same); *SlimAmerica*, 77 F. Supp. 2d at 1274 ("Scientific
     validation of the defendants' product claims requires a double blind study of the combination of ingredients used in
25   [the weight loss product]."); *Porter & Dietsch, Inc.,* 90 F.T.C. 770, 885 (1977) (claims that any food, drug, or device
     can help a user achieve any result, such as weight loss, require "competent scientific or medical tests or studies"),
26   *aff'd as modified*, 605 F.2d 294 (7th Cir. 1979).

27   [102]  *See, e.g., QT*, 448 F. Supp. 2d at 962; *SlimAmerica*, 77 F. Supp. 2d at 1274.

28   [103]  TRO Exh. 3, p. 243, ¶ 4.

     [104]  TRO Exh. 3, p. 261, ¶ 51f.

FEDERAL TRADE COMMISSION
915 Second Ave., Su. 2896
Seattle, Washington 98174
(206) 220-6350

intense exercise, can cause the claimed amount of weight loss.[105]  Defendant's claims relating to the purported weight loss benefits of acai berry products, alone or in combination with the colon cleanse products, are both false and unsubstantiated.

Defendant's claims that acai berry and colon cleanse products can cause dramatic weight loss are clearly material to consumers' decision to purchase the advertised products for the same reasons his other deceptive statements on his fake news sites are material.[106]  Defendant's representations concerning weight loss claims are therefore deceptive acts or practices that violate Sections 5(a) and 12 of the FTC Act.

### 3. The Balance Of The Equities Weighs Heavily in Favor of the Requested Injunctive Relief.

As discussed above, preliminary relief is appropriate if the FTC is likely to succeed on the merits and the Court finds that the equities weigh in favor of granting the relief sought.  In weighing the equities, the Ninth Circuit has held that the public interest should receive greater weight than private interests.[107]  Defendant's false or deceptive statements to consumers are not in the public interest.

Given the pervasive nature of Defendant's deceptive advertisements, there is a strong likelihood that, absent injunctive relief, Defendant will continue to deceive consumers.[108]  As discussed above, Defendant's law violations are central to the success of his business.  Stripped of their deceptions, the advertisements are virtually devoid of content.  Defendant has continued to use the deceptive news format to market the acai berry and colon cleanse products notwithstanding the fact that his weight loss claims are false and unsubstantiated.[109]  Moreover, Defendant's recent conduct demonstrates that his fake news format is easily adaptable and that he will continue to use it to deceive

---

[105]  TRO Exh. 3, p. 243, ¶ 5.

[106]  *See supra* pp. 16-18.

[107]  *Affordable Media*, 179 F.3d at 1236; *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1165 (9th Cir. 1984).

[108]  *See FTC v. Southwest Sunsites, Inc.*, 665 F.2d 711, 723 (5th Cir. 1982) (finding "a large-scale systematic scheme tainted by fraudulent and deceptive practices" gives rise to the "reasonable expectation of continued violations"), *cert. denied*, 456 U.S. 973 (1982).

[109]  *See supra* pp. 8-10.

FEDERAL TRADE COMMISSION
915 Second Ave., Su. 2896
Seattle, Washington 98174
(206) 220-6350

consumers.  As noted above,[110] Defendant has switched the products and services he peddles on his websites several times over the last several weeks.  In just January and February of this year, Defendant has invested $125,000 in having ads placed to drive Internet traffic to his websites.  The products and services change, but his fake news report remains virtually the same.

By contrast, the private equities in this case are simply not compelling.  The conduct prohibitions contained in the proposed TRO would impose no hardship on Defendant as he has no right to engage in practices that violate federal laws.[111]  A "court of equity is under no duty to 'protect illegitimate profits or advance business which is conducted [illegally].'"[112]  Moreover, the public interest in preserving the illicit proceeds of this scheme for restitution to victims is great.[113]

### 4. A TRO Is Necessary To Halt Ongoing Fraud and Prevent Future Consumer Injury.

Ultimately, the FTC seeks the disgorgement of Defendant's ill-gotten gains.  To ensure the possibility of such relief, the TRO is designed to preserve the status quo, pending a hearing on preliminary injunctive relief.  The TRO would: (1) require that Defendant immediately cease his deceptive advertising practices; (2) require an accounting of Defendant's assets; (3) preserve Defendant's assets; and (4) allow for expedited discovery of Defendant's assets.

### a. The Preservation and Accounting of Assets are Necessary.

The FTC requests that the Court issue an order requiring the Defendant to: (1) preserve assets and evidence and (2) provide an accounting, including Defendant's completion of a financial disclosure form, to determine whether and to what extent an asset freeze order may be appropriate at the preliminary injunction phase to preserve assets should disgorgement be warranted.[114]  Such an

---

[110]  *See supra* p. 6.

[111]  *See World Wide Factors*, 882 F.2d at 347 (upholding district court finding that "there is no oppressive hardship to defendants in requiring them to comply with the FTC Act, refrain from fraudulent representation, or preserve their assets from dissipation or concealment").

[112]  *CFTC v. British Am. Commodity Options Corp.*, 560 F.2d 135, 143 (2d Cir. 1977) (quoting *FTC v. Thomsen-King & Co.*, 109 F.2d 516, 519 (7th Cir. 1940)), *cert. denied*, 438 U.S. 905 (1978).

[113]  *See Affordable Media*, 179 F.3d at 1236.

[114]  *See, e.g.*, *Affordable Media*, 179 F.3d at 1232 n.2 (defendants required to provide financial statements to FTC); *SEC v. Bankers Alliance Corp.*, 881 F. Supp. 673, 677 (D.D.C. 1995) (ordering an accounting); *SEC v. Parkersburg Wireless LLC*, 156 F.R.D. 529, 533-34 (D.D.C. 1994) (same).

1  order is well within the Court's authority.[115]  The Court has the discretion to freeze a defendant's assets

2  once the Court determines that the FTC is likely to prevail on the merits and restitution would be an

3  appropriate final remedy.[116]  "A party seeking an asset freeze must show a likelihood of dissipation of

4  the claimed assets, or other inability to recover monetary damages, if relief is not granted."[117]  Where a

5  defendant's business is permeated with fraud, the court may conclude that there is a likelihood of

6  defendant attempting to dissipate or conceal assets while the action is pending and may grant an asset

7  freeze.[118]  Further, an asset freeze is appropriate where, as here, the FTC's objective is "to obtain

8  restitution of monies fraudulently obtained."[119]

9      The FTC's evidence is sufficient to show that in the absence of an asset freeze, Defendant is

10  likely to dissipate assets.  Defendant's business practices are rife with deception.  Moreover,

11  Defendant has recently dissipated a substantial amount of assets to further his deception of consumers.

12  Of the more than $221,000 Defendant paid to Pulse360 to place ads to drive consumers to his

13  deceptive websites between May 2009 and February 2011, more than half was spent very recently, in

14  the first two months of this year.[120]  Defendant's Facebook page shows that he has recently purchased a

15

16  _____

17  [115]  *See Singer*, 668 F.2d at 1113 ("[Section] 13(b) provides a basis for an order freezing assets."); *U.S. Oil*

18  *& Gas*, 748 F.2d at 1432-35.  Asset freezes have been ordered in many other actions brought by the FTC.  *See, e.g.,*
*Affordable Media*, 179 F.3d at 1232 (describing district court issuance of *ex parte* TRO with asset freeze and
repatriation); *FTC v. Advanced Mgmt. Servs. NW LLC*, CV-10-148-LRS (E.D. Wash. May 10, 2010); *FTC v. MCS*

19  *Programs, LLC*, C09-5380RBL (W.D. Wash. June 26, 2009); *FTC v. Bargains & Deals Magazine LLC*, C01-1610P
(W.D. Wash. Oct. 11, 2001); *FTC v. Canada Prepaid Legal Servs., Inc.*, CV00-2080 (W.D. Wash. Dec. 11, 2000);

20  *FTC v. Fortuna Alliance LLC*, C96-799M (W.D. Wash. May 24, 1996); *FTC v. US Foreclosure Relief Corp.*, SA-
CV09-768 JVS (MLGX) (C.D. Cal. July 7, 2009); *FTC v. Gov't Careers, Inc.*, No. 721-TUC-DCB (D. Ariz. July

21  27, 2009); and *FTC v. Dinamica Financiera LLC*, 09-CV-03554 (C.D. Cal. May 20, 2009).

22  [116]  *See World Travel*, 861 F.2d at 1031 (upholding preliminary injunction freezing assets where an
appropriate remedy would be restitution).

23
24  [117]  *Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009).  There, the Ninth Circuit overruled its
holding in *FSLIC v. Sahni*, 868 F.2d 1096, 1097 (9th Cir. 1989), that the petitioner needed to show only a
"possibility of dissipation" when seeking an asset freeze.  The *Johnson* court based its new "likelihood of

25  dissipation" standard on *Winter v. Natural Res. Defense Council, Inc.*, 129 S.Ct. 365, 374 (2008) (moving party must
show a "likelihood" rather than the mere "possibility" of irreparable harm).

26
27  [118]  *See, e.g., World Travel*, 861 F.2d at 1031; *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1106 (2d
Cir. 1972); *SEC v. R.J. Allen & Assocs.*, 386 F. Supp. 866, 881 (S.D. Fla. 1974).

28  [119]  *Singer*, 668 F.2d at 1113.

[120]  February 2011 is the latest month for which Pulse360 produced data.  TRO Exh. 1, p. 12, ¶ 44.

FEDERAL TRADE COMMISSION
915 Second Ave., Su. 2896
Seattle, Washington 98174
(206) 220-6350

1  new car and has taken, or plans to take, trips to California, Hawaii, and the Bahamas.[121]  His conduct

2  shows that he will likely continue to dissipate assets unless and until he is required by court order to

3  stop.  Further asset dissipation by the Defendant would thwart this Court's ability to preserve the

4  possibility of effective final relief.

5       The proposed asset freeze will not pose an undue burden on Defendant, as the relief requested

6  is narrowly tailored to preserve the status quo.  In addition, the relief requested would permit

7  Defendant to dissipate assets needed to pay "actual, ordinary and necessary business or living

8  expenses," by agreement with counsel for the FTC.[122]

9            b.    Limited Expedited Discovery and Other Ancillary Relief are
                   Appropriate.

10      The FTC also seeks limited expedited discovery relating to Defendant's unjust enrichment

11  from the merchants whose products and services Defendant promoted on his fake news sites.  In

12  conjunction with the requested accounting, limited expedited discovery will enable the FTC to

13  determine whether it will seek as part of a preliminary injunction a comprehensive asset freeze to

14  prevent dissipation of Defendant's assets.  Moreover, the prompt and full disclosure of the scope and

15  financial status of Defendant's business operations is necessary to ensure that the Court is fully

16  advised regarding: (1) the nature, extent, status and location of Defendant's assets; (2) the nature and

17  location of documents reflecting Defendant's business transactions; (3) the scope of Defendant's

18  business activities, including where he conducts these activities (especially important in light of the

19  defunct status of two of Defendant's corporations and his use of a maildrop box for business and

20  personal use); and (4) the existence of any additional fake news sites operated by Defendant.[123]  For

21  these reasons, the proposed Order requires that Defendant produce certain financial records and

22  information on short notice, and requires financial institutions served with the order to disclose

23  whether they are holding any of Defendant's assets.

24      District courts are authorized to depart from normal discovery procedures and fashion

25  discovery to meet discovery needs in particular cases.  Fed. R. Civ. P. 26(d), 33(a), and 34(b) authorize

26  _____

27  [121]  TRO Exh. 1, p. 12, ¶ 46.

28  [122]  Proposed Temporary Restraining Order, pp. 5-6, § III.C.

[123]  Defendant may use domain name registrars other than GoDaddy.com.

Motion for TRO and Supporting Memorandum      23

FEDERAL TRADE COMMISSION
915 Second Ave., Su. 2896
Seattle, Washington 98174
(206) 220-6350

1  the Court to alter the standard provisions, including applicable time frames, that govern depositions

2  and production of documents.  This type of discovery order reflects the Court's broad and flexible

3  authority in equity to grant preliminary emergency relief in cases involving the public interest.[124]

4       The requested relief is necessary to identify and preserve assets Defendant wrongfully obtained

5  from consumers.  Any hardship on Defendant caused by the relief sought is greatly outweighed by the

6  public's interest in preserving evidence and assets obtained through Defendant's unlawful practices.

7  **V.    CONCLUSION**

8       Plaintiff urges this Court to issue the proposed TRO, including an order preserving Defendant's

9  assets, permitting limited expedited discovery, and directing Defendant to show cause why a

10 preliminary injunction should not issue.  The compelling evidence of deception in this case justifies

11 the burden that a TRO would impose on Defendant.  Absent such immediate relief, Defendant will

12 continue – and possibly expand – his deceptive practices.  Moreover, the TRO is subject to prompt

13 reconsideration and modification, if warranted, thereby minimizing the potential harm to Defendant.

14

15 Dated: April 13, 2011                          Respectfully Submitted,

16                                                WILLARD K. TOM
17                                                General Counsel
                                                 ROBERT J. SCHROEDER
18                                               Regional Director

19                                               s/ Julie K. Mayer
                                                 JULIE K. MAYER, WSBA #34638
20                                               LAURA M. SOLIS, WSBA #36005
                                                 Federal Trade Commission
21                                               915 Second Avenue, Suite 2896
                                                 Seattle, Washington 98174
22                                               (206) 220-4475 (Mayer)
                                                 (206) 220-4544 (Solis)
23                                               jmayer@ftc.gov
                                                 lsolis@ftc.gov
24

25

26      [124]  *See Porter*, 328 U.S. at 398 (if public interest is involved, court's equitable powers are broader and
27 more flexible than if only private controversy is at stake); *Singer*, 668 F.2d at 1112; *FTC v. Equifin Int'l, Inc*., No.
   CV 97-4526-DT, 1997 U.S. Dist. LEXIS 10288, at *40 (C.D. Cal. July 3, 1997) (courts may impose appropriate
28 provisional remedies, including expedited discovery, at *Fed. Express Corp. v. Fed. Express, Inc.*, No. 97-CV-1219,
   1997 U.S. Dist. LEXIS 19144, at *6 (N.D.N.Y. Nov. 24, 1997) (early discovery "will be appropriate in some cases,
   such as those involving requests for a preliminary injunction ") (quoting commentary to Fed. R. Civ. P. 26(d)).

FEDERAL TRADE COMMISSION
915 Second Ave., Su. 2896
Seattle, Washington 98174
(206) 220-6350